New York City Construction, Inc., Plaintiff,

against
Morgenstern Bros. Realty Inc., Defendant.


502527/2015 

Attorney for Plaintiff:
Sharyn A. Tritto Esq.
Norris McLaughlin & Marcus, P.A.
875 Third Avenue, 8th Floor
New York, NY 10022
Attorney for Defendant:
David Brody, Esq.
Borah, Goldstein, Altschuler, Nahins & Goidel, P.C.
377 Broadway, 6th Floor
New York, New York 10013


Carolyn E. Demarest, J.

The following e-filed papers read herein: NYCEF No.
Notice of Motion/Order to Show Cause/Petition/Cross Motion and Affidavits (Affirmations) Annexed 1-6, 12-13, 23-24, 37-39
Opposing Affidavits (Affirmations) 14-21, 25-28, 29-31
Reply Affidavits(Affirmations)
Affidavits(Affirmations)
Other Papers (Memoranda of Law) 8-9, 34-36
Plaintiff ("Tenant"), a commercial leaseholder, brought this action by Order to Show Cause (OSC) on March 6, 2015, seeking injunctive relief pursuant to First National Stores, Inc. v Yellowstone Shopping Center, Inc., (21 NY2d 630 [1968]) ("Yellowstone"). Defendant ("Landlord" or "Owner"), the title-holder of the disputed property located at 281(a/k/a 281-285) [*2]North 7 Street in the Williamsburg section of Brooklyn (the "Premises" or "Property"), served plaintiff with a Notice to Cure ("NTC") on February 24, 2015, in which it alleged certain enumerated defaults under the terms of the lease agreement, including, inter alia, failure to maintain the premises in good repair and the conversion of the premises from commercial to residential use without first obtaining a certificate of occupancy for such use, resulting in applications by Tenant's own tenants ("Occupants") for coverage under the Loft Law. Plaintiff was granted a Temporary Restraining Order (TRO) by Justice David Schmidt (now retired) staying the termination of the Leasehold and commencement of a summary proceeding pending the hearing of the OSC. 
PROCEDURAL HISTORY
The matter first came before me, following Justice Schmidt's retirement, on May 20, 2015. At that time, the Occupants' application was pending before the Loft Board and the Administrative Judge presiding over the matter had denied summary judgment with respect to the determination of coverage for their units and for themselves as occupants, notwithstanding plaintiff Tenant's consent to registration of the building as an Interim Multiple Dwelling (IMD) and seven units as IMD units. Defendant Owner disputed coverage. The Administrative Law Judge calendared the matter for trial beginning on May 4, 2015, and the administrative hearing has since been concluded, however, as of this date, no determination has been forwarded to the Loft Board for final decision.
At that initial appearance on May 20, Landlord did not seek to vacate the TRO, and acknowledged that the issue of insurance coverage that had been alleged in the NTC might be curable in the specific circumstances at bar because plaintiff did have coverage, but continued to insist that serious conditions remained to be cured, including a sprinkler violation issued by the Department of Buildings (DOB), roof repairs and a parapet wall that was leaning. Tenant did not dispute that it had illegally sublet for residential occupancy prior to obtaining a certificate of occupancy for such purpose, but claimed that the sprinkler violation had been addressed and other repairs had either been completed, or would be done soon. Landlord insisted that the failure to obtain a certificate of occupancy prior to permitting residential occupancy was an incurable breach because it had "destroyed at least half the value of the building" in that the rent could never be "free market". 
After ascertaining that plaintiff had substantially complied with the conditions set forth in the TRO granted by Justice Schmidt, upon Tenant's representation that it was in the process of seeking to remedy conditions in the building and legalizing the premises by obtaining a certificate of occupancy for residential use, but needed Owner's co-operation in signing off on submissions to the DOB, this Court directed both sides, at Landlord's suggestion, to perform an inspection of the building and the work that had already been performed and exchange reports, so as to be prepared for a possible hearing.
On the adjourned July date, full inspections had not been performed, necessitating further adjournment to September. On September 10, Tenant represented that the plans for a residential conversion of the building had been prepared but that Owner's signature was required. The Loft Board proceeding was continuing. Both sides predicted that the Loft Board would find coverage for the Occupants, though Owner and Tenant were co-ordinating their defense to Occupants' application. In light of the expectation that ultimately a residential certificate of occupancy [*3]would be required, the Court directed Owner to sign off on the application to the DOB for the certificate of occupancy, without prejudice to its claims that the breach in permitting the illegal occupancy could not be cured. A hearing was scheduled for October 26 with respect to the sufficiency of the repairs, which was disputed between the parties' experts.
On October 26, as the Loft Board hearing continued independently, this Court took evidence from Nathaniel Smith, plaintiff's engineer, regarding conditions of the roof, sky lights, stairs, ceiling leaks, brick masonry, fire escapes, and flooring. His testimony was continued to November 30, to allow for roof probes to be inspected by Owner's expert. Testimony was also elicited on November 30 from Gary H. Silver, plaintiff's architect of record and an expert in loft conversions, with respect to plans submitted to DOB for legalization of the building. The hearing was adjourned to December 14 to provide for an exchange of all documents that had been submitted to the DOB.
On December 14, the parties agreed to suspend further hearing and entered into an agreement providing for the sale of the building by defendant Landlord and surrender of the Lease by plaintiff Tenant upon payment of compensation to be calculated based upon the sale price. A valuation of the property was to be obtained. Under the terms of their agreement, no further efforts to cure were required of plaintiff except prosecution of the application to the DOB for a residential certificate of occupancy and the duty to respond to any emergency. The hearing before the Administrative Law Judge had been concluded.
On January 20, 2016, both parties agreed to abort the hearing and begin to market the property with the Lease forfeiture. Further negotiations were held regarding the terms of settlement. The case was adjourned to February 24, 2016 to complete an appraisal of the Property. On February 24, the terms of settlement were still not final though both sides agreed that steps would be required to conform to the Loft Law. The Loft Board had not acted. Defendant agreed to withdraw its NTC. The case was once again adjourned in the expectation that a final settlement would be reached. On March 9, 2016, the Court was advised that a settlement was no longer intended and a ruling on Landlord's claim, that the illegal sublet of commercial premises for residential use constituted an incurable default which precluded the granting of Yellowstone relief, was requested.
BACKGROUND
Defendant is the legal owner of the Premises, having taken title by deed dated March 7, 1997. The Property was covered by a commercial certificate of occupancy at the time of defendant's acquisition thereof and had been previously used by the family of the principals of defendant as a warehouse for the storage of groceries in their business, Morgenstern Bros. Wholesale Grocers, Inc. Plaintiff's president, Paul Joffe (Joffe), assumed possession of the Premises from defendant, pursuant to a forty-year net net net "Agreement of Lease" (the "Lease") on May 1, 1997.[FN1]
The Lease provided for annual rent of $100,000 for the first ten years [*4]of the lease term, and incremental increases of $10,000 every ten years thereafter until the termination date of April 30, 2037. By separate agreement titled "Assignment and Assumption of Lease", Joffe transferred his "right, title and interest" in the leased Premises to plaintiff on June 18, 1997 ("Assignment"). 
Pursuant to the terms of the Lease, Tenant agreed to "use and occupy the building for that use permitted by the Certificate of Occupancy for the building," and further agreed "not to commit any act or thing which shall violate the Certificate of Occupancy" (Agreement of Lease at ¶4(a)). The Lease further provided (at ¶4(b)):
Tenant will be allowed to amend the current Certificate of Occupancy so as to obtain a final Certificate of Occupancy for a commercial use building. Tenant will be responsible to file for, and obtain, all zoning and variance changes that may be needed to obtain a final commercial Certificate of Occupancy. Landlord agrees to cooperate in such filing and to execute such documents as are required provided the same do not subject the Landlord to personal liability.
Pursuant to the Lease, Tenant agreed "promptly to comply with any and all laws ordinances or orders of all municipal, State and Federal authorities, bureaus, commissions and other governmental agencies with respect to the demised premises" and "at its own cost and expense, [to] promptly comply with any such orders or ordinances involving the alterations or additions to the demised premises" (Lease at ¶15). The Lease provided for a ten day period in which Tenant could begin to cure any alleged defaults, the expiration of which would trigger Landlord's right to serve a written notice of cancellation of the lease (Lease at ¶ 26(a)).
On December 3, 1997, Peachy Construction filed an application with the DOB on behalf of Owner, Morgenstern Bros Realty, Inc., to convert the building from commercial use to mixed commercial and residential use. That application was disapproved on December 31, 1997, and was ultimately withdrawn on December 31, 2011. According to the Affidavit of defendant's principal, Carol Morgenstern (Morgenstern), because the Lease would have "prohibited" the conversion to residential use, on June 8, 1999, the Landlord and Tenant executed a "Second Modification of Lease" [FN2]
in which, inter alia, paragraph 4(b) of the Lease was amended such that the reference to a Certificate of Occupancy for a "commercial" use building would "include a residential apartment building" (Second Modification at ¶1). The modification does not restrict or define such "residential apartment building" in any manner.
Defendant, through its principal Morgenstern, states that in the spring of 2014, it learned that the Tenant's subtenants at the Premises had filed for coverage under the New York State Loft Law on the grounds that "they had been using various portions of the Property for residential purposes despite the lack of a residential Certificate of Occupancy." (Morgenstern Affidavit at ¶13). On February 13, 2015, the Occupants of seven units at the Premises moved for summary judgment before Administrative Law Judge Ingrid Addison (OATH Index No. 25645/2014), [*5]seeking a finding of coverage under the Loft Law(Multiple Dwelling Law(MDL), Article 7-C). Affidavits and supporting documentary proof of occupancy from the building's residents from 2008 to the present, and a printout from the DOB indicating that no residential certificate of occupancy was on file for the Premises, were submitted in support of the Occupants' motion (Defendant's Affidavit in Opposition, Exhibit C). As noted, by Memorandum Decision dated May 1, 2015(ALJ Tynia D. Richard [Loft Bd Dkt No.TR-1180]), that motion was denied and a hearing was subsequently held. The decision of the Administrative Law Judge is pending.
Defendant served plaintiff with its NTC on February 25, 2015, alleging various defaults in failing to maintain the Property, as well as the failure to legally convert the building to residential use prior to permitting such occupancy, in violation of the terms of the Lease, citing paragraph 26 of the Lease providing for a ten day window to cure. Plaintiff filed its summons and complaint in the instant action, dated March 3, 2015, seeking a declaration as to the rights of the parties. On March 6, 2015, Justice Schmidt entered the OSC containing the TRO staying termination of the Lease and prosecution of any proceeding based upon the NTC and tolling plaintiff's time to cure. Defendant opposed the granting of a Yellowstone injunction claiming that "Tenant's undisputed failure to timely, properly and legally convert the subject premises from commercial use to residential use before subletting it for such use, with one of the results being that the building is subject to rent regulation, instead of being free market rentals" is incurable. Defendant contends that subjecting the Property to rent regulation under the Loft Law so diminishes the value of "Owner's residual estate" that the breach of the Lease cannot be cured. The Court has taken substantial testimony regarding the issues raised in the NTC and, while the hearing has never been concluded, upon the agreement of the parties, all alleged defaults have been resolved except the status of the Premises as an Interim Multiple Dwelling covered under the Loft Law, and the curability of Tenant's failure to obtain a residential certificate of occupancy.
DISCUSSION
The purpose of the Yellowstone injunction (see First National Stores, Inc v Yellowstone Shopping Center,Inc, 21 NY2d 630 [1968]) is to preserve the status quo such that "a commercial tenant, when confronted by a threat of termination of its lease, may protect its investment in the leasehold by obtaining a stay tolling the cure period so that upon an adverse determination on the merits the tenant may cure the default and avoid a forfeiture." (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d 508, 514 [1999]; see also, Times Square Stores Corporation v Bernice Realty Co., 107 AD2d 677, 680 [2d Dept 1985]; M.B.S. Love Unlimited, Inc v Jaclyn Realty Assoc., 215 AD2d 537, 538 [2d Dept 1995]). In order to obtain a Yellowstone injunction, the moving party must show the Court that: "(1) it holds a commercial lease; (2) it received from the landlord either a notice of default, a notice to cure, or a threat of termination of the lease; (3) it requested injunctive relief prior to the termination of the lease; and (4) it is prepared and maintains the ability to cure the alleged default by any means short of vacating the premises."(225 E. 36th St. Garage Corp. v 221 E. 36th Owners Corp., 211 AD2d 420, 421 [1st Dept 1995]). Plaintiff has met the first three of these requirements. The remaining dispute is whether plaintiff maintains the ability to cure the alleged default with respect to the modification of the certificate of occupancy. Defendant argues that plaintiff's failure to legally convert the Premises from commercial to residential use before permitting the [*6]Occupants to reside in the Premises is incapable of being cured given that the Occupants' application for coverage under the Multiple Dwelling Law, now pending before the Loft Board, will indelibly subject the Premises to rent regulation, thereby creating a degree of financial and legal exposure on the part of the Owner that cannot be undone. Plaintiff, on the other hand, contends that it is entitled to a Yellowstone injunction as it is now taking the appropriate steps to obtain a residential certificate of occupancy, thus curing the alleged default.
The Occupants' leases, submitted as part of plaintiff's OSC as Exhibit E, indicate that the units were all leased as "Art Studio"or "Dance Studio" or for other commercial purpose, beginning in July, 1997, shortly before the filing of the application to convert the certificate of occupancy from commercial to mixed commercial and residential use, apparently with Owner's consent. Many of the leases contain an express prohibition against living or sleeping in the premises. The earliest leases provide for a delay in occupancy in order for plaintiff Tenant to complete construction of renovations. It appears from the application for a change in the certificate of occupancy that the building had never been occupied for a purpose other than commercial use and that the proposed change would effect an upgrade in use consistent with the purpose of exempting such properties from rent stabilization(see 22 CPS Owner LLC v Carter, 84 AD3d 456, 457 [1st Dept 2011]: "Because the purpose of the exemption from rent stabilization based on the substantial rehabilitation of a building is to encourage landlords to renovate buildings and add new residential units to the housing stock [citations omitted], the conversion of a purely commercial space into an almost purely residential space, . . . is a substantial rehabilitation so as to exempt the building from rent stabilization"; see also, Wilson v One Ten Duane Street Realty Co., 123 AD2d 198, 201[1st Dept 1987]; Bartis v Harbor Tech, LLC, 2014 WL 2861558 (Sup Ct, Kings County 2014)). While Occupants' eligibility for coverage under rent regulations will depend on the facts of the case (see Wilson), which presumably are the subject of the hearing before the Loft Board, there appears to be a possibility that Owner's premise, that these Occupants and their units will become subject to rent regulation, thereby depriving Owner of value, may be a false premise and the building may be exempt from such regulation. At the very least, a question of fact is raised that cannot, and should not, be determined upon this motion for a Yellowstone injunction.[FN3]

As Landlord appears to acknowledge in its Brief in Opposition dated March 21, 2016 (at page 12), such illegal tenancies as exist at present can be made legal pursuant to the Loft Law [*7](MDL §§280 et seq.), and the occupancy of a leased premises in violation of the certificate of occupancy is not, therefore, per se, incurable (see Manhattan Parking System-Service Corp v Murray House Owners Corp., 211 AD2d 534 [1st Dept 1995]). Landlord relies on Lease paragraphs 15, 24(a) and 4, as amended by the Second Modification, to argue, however, that the permitted modification of the certificate of occupancy to include residential use was required to be effected before such occupancy occurred. Paragraph 15 generally provides that Tenant will comply with all laws applicable to physical maintenance of the Premises, but does not specifically address a certificate of occupancy or mention the intended use and occupancy of the building. Paragraph 4(a), however, expressly states:
Tenant shall use and occupy the building for that use permitted by the Certificate of Occupancy for the building, and Tenant agrees not to commit any act or thing which shall violate the Certificate of Occupancy.
There is no question that the Occupants' use of their units for residential purposes, while in violation of their own leases, also constitutes a violation of MDL §301 and thus, concomitantly, created a default in Tenant's obligations under the Lease. Such default is clearly curable however. As noted above, paragraph 4(b), as modified, authorized Tenant to amend the certificate of occupancy to allow for residential use and it is apparent that Tenant's alteration of the Premises to permit legal residential occupancy was intended by the parties. Contrary to Landlord's claim that it will suffer permanent loss of value because Interim Multiple Dwelling designation will deprive it of economic value in contravention of its right to have a free-market, unregulated residential building at the end of the Lease term, there is no such provision limiting the character of the residential property in the Lease.
Landlord also contends that paragraph 24(a) of the Lease requires that amendment of the certificate of occupancy precede any residential occupancy. Paragraph 24(a) provides:
This lease may not be assigned without the written consent of the Landlord. The Landlord agrees to not unreasonably withhold its consent to said Assignment. In the event Tenant completes its alterations and renovations to the building and obtains a commercial Certificate of Occupancy, Tenant may sublet portions of the building to various subtenants without the prior consent of the Landlord.
While this provision speaks to the need to obtain Landlord consent to subletting prior to completion of alterations and renovations and permits subletting without consent after the completion of such renovations, it does not require an amendment to the certificate of occupancy before subletting may take place. In fact, an application for such amendment, though disapproved, was pending at the time such residential occupancy commenced and was not withdrawn until 2011, for reasons not disclosed to the Court. Whether the illegal occupancy in violation of the certificate of occupancy was known to Landlord, or to Tenant, throughout the several years it allegedly continued, or was even commenced with Landlord's consent, raises questions of fact that cannot be properly resolved upon this application for Yellowstone relief (see, e.g., South Eleventh Street Tenants Assoc v Dov Land LLC,59 AD3d 426, 428 [2d Dept 2009]; 2914 Third Sportswear Realty Corp v Acadia 2914 Third Ave, LLC, 93 AD3d 573 [1st Dept 2012]).
While it is true that an incurable breach of the Lease will preclude the granting of a Yellowstone injunction (see Zona, Inc v Soho Centrale, LLC, 270 AD2d 12, 14 [1st Dept 2000]), [*8]and it is Tenant's obligation to demonstrate that it is capable of curing the alleged breach without removing itself from the premises (see Demler v Bing & Bing Management, Inc., 116 Misc 2d 793, 796 [Sup Ct, New York County 1982]), Yellowstone injunctions have been routinely granted where there is even a minimal demonstration of efforts to cure and the willingness to do so. "The threat of termination of the lease and forfeiture, standing alone, has been sufficient to permit maintenance of the status quo by injunction" (Post v 120 East End Avenue Corp., 62 NY2d 19, 26 [1984]; see also, Lew-Mark Cleaners Corp v DeMartini, 128 AD2d 7858[2d Dept 1987];Times Square Stores Corporation v Bernice Realty, 107 AD2d at 680-681; Herzfeld & Stern v Ironwood Realty Corporation, 102 AD2d 737, 738 [1st Dept 1984]).
Multiple Dwelling Law §282 confers upon the Loft Board authority to determine IMD coverage and related statutory coverage such as rent stabilization, claims for rent adjustment, compliance with minimum housing maintenance standards and other related controversies. There is currently pending before that Board, Occupants' application for IMD status. It has been the pendency of that application that has caused the Court to defer decision on the request for Yellowstone relief since it is entirely possible that such status may be denied, potentially rendering moot the Owner's claim that rent regulation will diminish the value of the Property (see generally, MDL §281). Moreover, as there remain 21 years on the Lease term, the probability that the present Occupants will remain in possession throughout the remaining term is slight. It is noted that rent stabilization coverage under the Loft Law can be extinguished in a number of ways, including abandonment, sale of the tenant's fixtures at fair market value, purchase of tenant's rights by landlord or proof of hardship (Andrew Scherer and Fern Fisher, Residential Landlord-Tenant Law in New York §§6:98-6:100[West Practice Guide 2014]; Gerald Lebovits and Linda Rzesniowiecki, The New York Loft Law NYSBA NY Real Prop LJ at 23-24 [Spring 2010] ). Under these circumstances, the Owner's claim is speculative. It is probable that the alleged breach in failing to amend the certificate of occupancy in advance of Occupants' residential occupancy will be cured within the Lease term, without any resulting loss of value to Owner. In any event, the Lease does not guaranty that the Premises, upon conversion to residential occupancy, will not be subject to rent regulation.
Tenant has taken steps both to obtain the necessary amendment to the certificate of occupancy to permit residential use and to cure any physical deficiencies in the habitability of the building for residential purposes. Evidence at the hearing clearly supports a finding that Tenant is seeking to cure the physical and structural defects in building maintenance that were cited in Owner's NTC, including insufficiencies in the sprinkler system. Given the pendency of the administrative proceedings, which will determine some of the factual questions regarding Occupants' status under the Loft Law, it would be error to fail to grant the requested Yellowstone injunction pending the determination of the Loft Board (see TSI West 14, Inc v Samson Associates, LLC, 8 AD3d 51, 52 [1st Dept 2004]; Coinmach Corporation v Haron Associates, 304 AD2d 705 [2d Dept 2003]; Cohn v White Oak Cooperative Housing Corp.,243 AD2d 440 [2d Dept 1997]; TSS-Seedman's, Inc v Elota Realty Company,134 AD2d 492, 493 [2d Dept 1987]). Accordingly, plaintiff Tenant's motion for a Yellowstone injunction is granted, staying the termination of its lease and affording it a reasonable period to complete a cure, which is not within its control as both the Loft Board and the DOB must act before a cure can be accomplished.
However, upon granting the requested relief, it is necessary that the Court direct the filing of an undertaking sufficient to secure any losses the defendant may incur as a result of the stay (Cohn, 243 AD2d 440; Times Square Stores, 107 AD2d at 681; Peron Restaurant v Young & Rubicam Inc., 179 AD2d 469, 470 [1st Dept 1992]). Defendant Landlord has suggested that a bond in the sum of $250,000 would be appropriate, citing Tenant's liability for legal fees it has incurred both with respect to the instant litigation and before the Loft Board, as well as any costs to be incurred in converting the Property to residential use. The Court agrees that this is an appropriate sum. Accordingly, in addition to continuing to promptly pay rent and additional rent, if any, Tenant shall post a bond with the Clerk of the Court in the sum of $250,000 on or before June 1, 2016, with verification of posting to Owner's counsel by June 3, 2016.
CONCLUSION
Plaintiff Tenant's motion for a preliminary Yellowstone injunction, staying the termination of the Lease, enjoining the commencement of any summary proceedings and tolling the running of the time to cure any violation of the Lease, is granted pending a determination of the facts and legal issues raised in this action.
Plaintiff shall post an undertaking with the Clerk of the Court in the sum of $250,000 on or before June 1, 2016, with proof thereof to defendant's counsel by June 3, 2016.
This matter is hereby referred to Commercial Part 11 for all further litigation.
This constitutes the Decision and Order of the Court.
Dated: May 11, 2016
CAROLYN E. DEMAREST
JUSTICE OF THE SUPREME COURT



Footnotes

Footnote 1:The Lease provided:
It is the intention of this lease that it be a net net net lease and that the Landlord shall receive its rent and any additional rent without any deduction for any charges or any expenses incurred in the ownership or operation of the real property, except the Landlord shall be required to make any mortgage payments affecting the real property (Lease at ¶13).

Footnote 2:On June 18, 1997, the Landlord and Tenant executed a "First Modification of Lease", 
in which Tenant was given, inter alia, "the right to mortgage" the Lease and "the leasehold 
estate" (First Modification at ¶1).

Footnote 3:This Court does not accept defendant's argument that the alleged breach here is analogous to the failure to maintain insurance and is therefore incapable of cure, as determined in Kyung Sik Kim v Idylwood, NY, LLC (66 AD3d 528 [1st Dept 2009]). The lack of insurance subjects the landlord to potential losses resulting from uninsured liability for events that may have occurred in the past and for which coverage can no longer be obtained. Here, it is possible to avoid irremediable consequences by converting to legal occupancy prospectively. Indeed, that is the very purpose of the Loft Law. As noted, there is nothing in the Lease that entitles Landlord to a residential building free of rent regulation. The Court further observes that, as argued by Tenant, the NTC did not cite a loss in market value of the Property as a default under the terms of the Lease. It is further noted that the NTC does recite a default with respect to insurance coverage, but it appears to have been cured by plaintiff's submission of proof of coverage.